# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

LUKE ADAMS,

      **Plaintiff,**

      v.                                         **Case No. 20-CV-1014-SCD**

ANDREW M. SAUL,
**Commissioner of Social Security,**

      **Defendant.**

## DECISION AND ORDER

      Luke Adams seeks Social Security disability benefits based on various mental impairments. Following a hearing, an administrative law judge determined that Adams was not disabled because he could still work despite certain mental-health limitations. Adams now seeks judicial review of that decision, arguing that the ALJ erred in evaluating his alleged symptoms, weighing the opinions of his treating therapist, not accepting all the opinions of a consultative examiner, and not accommodating his alleged variable functioning. Because substantial evidence supports the ALJ's decision and Adams has failed to demonstrate that the ALJ committed an error of law in reaching his decision, I will affirm the denial of disability benefits.

## BACKGROUND

      Adams filed this action on July 7, 2020, seeking judicial review of the final decision of the Commissioner of the Social Security Administration denying his claims for disability insurance benefits and supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me later that month after all parties

consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 6, 7. It is now fully briefed and ready for disposition. *See* ECF Nos. 18, 25, 26.

## I.    Procedural History

Adams applied for social security disability benefits in October 2016, alleging that he became disabled on June 15, 2016, when he was thirty-four years old. R. 13, 223–30.[1] His date last insured is December 31, 2018. R. 16. Adams asserted that he was unable to work due to panic attacks, depression, and attention deficit disorder. R. 252.

In May 2017, Adams was examined by Mark Pushkash, PhD, a consultant paid by the state agency responsible for first reviewing Adams' disability applications. *See* R. 417–19. In his psychological report, Dr. Pushkash opined that Adams had the intellectual capabilities to comprehend, recall, and follow through on instructions; that Adams' ability to concentrate and persist on work tasks "is likely to be moderately to severely impaired due to the interfering effects of anxiety"; that Adams would be able to appropriately relate to supervisors and co-workers; and that Adams had a low tolerance for frustration and his coping skills were poor due to depressed mood. R. 420.

Thereafter, Adams' applications were denied at the state-agency level. *See* R. 73–134. Kyla Holly, PsyD, evaluated Adams' impairments at the initial level of review. *See* R. 80–81, 93–94. Based on her review of the record, Dr. Holly opined that Adams had a "mild" limitation understanding, remembering, or applying information; a "moderate" limitation interacting with others; a "moderate limitation" concentrating, persisting, or maintaining

---

[1] The transcript is filed on the docket at ECF No. 16-2 to ECF No. 16-12.

pace; and a "moderate" limitation adapting or managing himself. R. 81, 94.[2] State-agency physician Stephen Kleinman, MD, reviewed the record at the reconsideration level and reached the same conclusions as Dr. Holly. R. 111–12, 127–28.

After the Commissioner denied Adams' applications at the state-agency level, Adams (along with his attorney) appeared via video before ALJ Edward D. Studzinski on April 12, 2019. *See* R. 39–72. At the time of the hearing, Adams was thirty-seven years old, he had a high school equivalence degree, and he was living in an upper-level duplex with his mother. R. 48, 56–57. Adams testified that he last worked full-time at Pool Works. R. 48. He was fired in June 2016—after working there only a few months—because he frequently showed up late. R. 48–49. Adams also reported that he had difficulty concentrating at work, he had panic attacks while working, and he had issues remembering. R. 49. Before the Pool Works job, Adams owned a bar from 2010 to 2016. *Id.* Adams testified that he had difficulty running the bar the last few years he operated it due to panic attacks. *Id.*

When asked about his day-to-day mental-health symptoms, Adams explained that he felt lightheadedness ("like a vertigo kind of thing"), chest tightness, shakes, and exhaustion; he also was very irritable. *Id.* He further explained that he needed to "lay down or get away from everything" and that his impairments caused daily issues with attention, concentration, and remembering. R. 49, 51–52. Adams stated that at times his impairments made it difficult to leave the house. R. 50. When his lawyer asked how often that happened over the last three

---

[2] The Social Security Administration "evaluates the effects of [a claimant's] mental disorder in each of the four areas of mental functioning based on a five-point rating scale consisting of none, mild, moderate, marked, and extreme limitation." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(F)(2). A claimant has a mild limitation in a functional area if his "functioning in [that] area independently, appropriately, effectively, and on a sustained basis is slightly limited." *Id.*, § 12.00(F)(2)(b). A claimant has a moderate limitation in a functional area if his "functioning in [that] area independently, appropriately, effectively, and on a sustained basis is fair." *Id.*, § 12.00(F)(2)(c).

years, Adams replied, "Let's say I would—if I would have two appointments a week or things I had to be at, I would probably say around 50 percent." R. 51. Adams indicated that he was prescribed Venlafaxine, which made him "[e]xtremely tired." R. 52. He also reported difficulty sleeping at night, stating, "I believe I do get the normal rate of sleep, I just don't know when I'm going to get it." *Id.* To make up for lost nighttime sleep, he took a nap two or three times a week. R. 52–53.

Adams estimated that he experienced approximately three panic attacks a week, but he hadn't been able to identify any triggers. R. 50. He stated that his panic attacks "can go on four hours" and that in the past he had been in the emergency room for a number of hours, unable to be calmed down. *Id.* Adams initially claimed that he had sought emergency-room treatment for panic attacks on average about ten to fifteen times each year. R. 60. However, when his lawyer indicated that the record did not support that level of frequency, he explained that it was difficult to provide accurate estimates because "there are times when I'm good for a long period of time but then, something . . . happens and I have to . . . seek services again." R. 60–65. Adams estimated that he had about six or seven "bad days" each month where he had difficulty getting out of bed or leaving the house. R. 65.

As for his daily activities, Adams stated that he could drive but that he tried not to venture too far from his house. R. 55. He stated that he went grocery shopping alone two or three times a month but that he typically went with his mom. R. 55–56. When asked if he had problems being in the grocery store, Adams replied, "It'll depend on how I'm feeling and sometimes I do have to . . . leave [without finishing my shopping]." R. 56. Adams indicated that he didn't have any hobbies. R. 58. He claimed that he used to be very socially active— when he owned the bar, he was a board member of the local tavern league—but not anymore.

R. 58–59. He reported that he tried getting out and interacting with people "whenever possible" and "[w]henever [he's] feeling good." R. 53–54. However, some days—about twice per week—he wouldn't do much of anything or even leave the house. R. 54–55.

Aimee Mowery testified at the hearing as a vocational expert. *See* R. 66–72. Mowery first identified Adams' past relevant work as an auto sales person (a skilled job performed at the light exertional level) and a composite job consisting of a bar manager (skilled, light), a bartender (semi-skilled, light), a bar helper (unskilled, medium), and a cleaner (unskilled, very heavy). R. 67–68. According to Mowery, a hypothetical person with Adams' age, education, and work experience could not perform any of those jobs if he had no exertional limitations but several non-exertional limitations to account for mental-health issues. R. 68–70. That person could, however, perform other jobs, such as a production helper or an inspector. R. 70. Mowery testified that employers typically tolerate only one unscheduled absence per month (or ten to twelve per year) and off-task behavior up to fifteen percent of the workday. R. 70–71. Mowery further testified that the hypothetical person could not perform the production helper or inspector jobs if he needed two or three unscheduled breaks during the workday, he needed to lie down for one hour during the day outside of normal breaks, or if he required an extra level of supervision to start or complete simple work tasks on a weekly basis. R. 71.

On August 1, 2019, the ALJ issued a written decision determining that Adams was not disabled and denying benefits. R. 10–38. The Social Security Administration's Appeals Council subsequently denied Adams's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). This action followed.

## II.     The ALJ's Decision

To be considered disabled under the Social Security Act, Adams had to prove that he was "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The social security regulations set out a five-step sequential evaluation process to determine disability status. *See* 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g). Adams had the burden of proof at each of the first four steps; the burden shifted to the Commissioner at the fifth, and final, step. *See Due v. Massanari*, 14 F. App'x 659, 664 (7th Cir. 2001) (citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).

Applying this standard five-step process, the ALJ here concluded that Adams was not disabled. The ALJ determined at step one that Adams had not engaged in substantial gainful activity since June 15, 2016, his alleged onset date. R. 16. At step two, the ALJ found that Adams had three "severe"[3] impairments: depression, anxiety, and a personality disorder. *Id.* The ALJ determined at step three that Adams' impairments, alone or in combination, didn't meet or equal the severity of a presumptively disabling impairment. *Id.* Specifically, the ALJ found that Adams had only a "moderate" limitation in each of the four areas of mental functioning a person uses in a work setting. R. 16–18.

The ALJ next assessed Adams' residual functional capacity—that is, his maximum capabilities despite his limitations, *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ found that Adams retained the ability "to work at all exertional levels, with no restriction of

---

[3] An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).

his ability to lift and/or carry, sit, stand, or walk throughout an 8-hour workday." R. 18.

However, the ALJ included several non-exertional limitations in the RFC assessment:

- He is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working on ladders, at unprotected heights, and he should avoid concentrated exposure to unguarded hazardous machinery such as a punch press and large robotic machinery;

- He is limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment;

- He should not perform work that requires multitasking;

- He could perform work requiring an average production pace, but he is incapable of significantly above average or highly variable production pace work;

- He should not perform work that requires significant self-direction;

- He is precluded from work involving direct public service, in person or over the phone, although he can tolerate brief and superficial interaction with the public that is incidental to his primary job duties;

- He should not work in crowded, hectic environments; and

- He can tolerate brief and superficial interaction with co-workers and supervisors as is common in unskilled work, but he cannot perform teamwork or tandem tasks.

R. 18–19.

After summarizing Adams' allegations and testimony, the ALJ concluded that Adams' medically determinable impairments could reasonably be expected to cause the symptoms he alleged but found that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 19–21. The ALJ recited Adams' medical history, highlighting moments when he complained of panic attacks and a depressed and anxious mood. *See* R. 21–29. The ALJ also acknowledged periods of exacerbating symptoms and times Adams went to the ER for panic-induced symptoms. *See id.* Based on this objective medical evidence, the ALJ found

that Adams' "mental impairments have caused moderate limitations throughout the period in question." R. 28.

Nevertheless, the ALJ did not credit Adams' subjective allegations of disabling mental-health symptoms. The ALJ noted that Adams' report to mental-health providers that he lost his bar due to taxes was "somewhat inconsistent with [his] testimony that he lost his bar due to panic attacks." R. 28. Moreover, although the record supported an exacerbation of symptoms during the summer of 2017, the ALJ determined that "the record does not support that this exacerbation lasted for 12 months, and overall documents improvement in [Adams'] symptoms thereafter with appropriate treatment and medication management." *Id.* (citing Exhibit 14F). The ALJ next found that the record did not support Adams' testimony that "he had been to the ER at least 10–15 times from the alleged onset date of June 2016 through 2017 and currently had 6–7 bad days per month when he does not leave home." R. 28. Also, according to the ALJ, emergency room records from 2016 and 2017 revealed that Adams "was not taking his medication as prescribed" and that he "did not require admission during these visits." R. 28–29 (citing Exhibits 2F, p. 7, 5F, 10F, and 18F).

The ALJ acknowledged that Adams missed a few appointments but found that his claim to "missing about 50% of his appointments due to an inability to leave home" was "inconsistent and not seen in the record." R. 29 (citing Exhibits 4F, 6F, 7F, 8F, and 14F). With respect to Adams' alleged disabling fatigue and absenteeism, the ALJ noted that Adams "acknowledged that he is able to sleep with improvement to 4–5 hour increments." R. 29 (citing Exhibit 8F, pp. 9–11). The ALJ determined that, "[o]verall, therapy records since September 2017 have shown less intense panic and an ability for [Adams] to get out and

communicate with others." R. 29 (citing Exhibit 14F). The ALJ also noted that Adams "testified that he is able to drive, run errands, and go places alone or with his mother." R. 29.

The ALJ also considered the medical opinion evidence and prior administrative medical findings. First were the opinions of Dr. Holly and Dr. Kleinman, the state-agency medical consultants who reviewed the record at the initial and reconsideration levels and opined that Adams had at most a moderate limitation in his mental functioning. R. 29 (citing Exhibits 3A, 4A, 7A, and 8A). The ALJ found those assessments "persuasive and generally well supported by and consistent with the expanded record." R. 29.

The ALJ next considered the opinions of Dr. Pushkash, the consultative psychological examiner who issued a psychological report that contained, among other things, a statement about Adams' ability to comprehend, recall, and follow through on instructions; to concentrate and persist on work tasks; to interact with supervisors and co-workers; and to handle stress. R. 29–30 (citing Exhibit 7F, p. 4). The ALJ found Dr. Pushkash's opinions "persuasive and consistent with moderate limitations as set forth in the residual functional capacity." R. 30. Also, according to the ALJ, Dr. Pushkash's opinions were "supported by [Adams'] presentation at [the consultative] examination as well as more recent therapy records at Exhibit 14F." *Id.* The ALJ did not separately analyze each of Dr. Pushkash's opinions.

Finally, the ALJ considered the opinions of Thomas Huskey, Adams' therapist and a licensed clinical social worker. R. 30 (citing Exhibit 11F). Huskey first saw Adams during a group therapy session in September 2017. *See* R. 529–31. He began seeing Adams for one-on-one therapy sessions in December 2017. *See* R. 540–51. On January 25, 2018—having seen Adams a total of six sessions, *see* R. 529–31, 533–34, 540–53, 556–62—Huskey completed a

mental impairment medical source statement in which he opined, among other things, that Adams would need to lie down for one hour during a typical eight-hour workday due to fatigue or related symptoms; that Adams would miss three days of work per month due poor sleep; that Adams would need two or three unscheduled breaks throughout the workday due to fatigue; that Adams would likely be unable to start or complete even simple work tasks without an unusual level of supervision three or more times per week; and that Adams exhibited a "marked" limitation in concentrating, persisting, or maintaining pace. *See* R. 470–74. Huskey wrote that his opinion concerning Adams' need to lie down during the workday was "per patient." R. 470.

The ALJ found Huskey's opinions not persuasive for four reasons. First, according to the ALJ, Huskey stated "that the limitations [were] 'per patient' and based largely on subjective allegations." R. 30. Second, the ALJ indicated that Huskey "had the opportunity to see [Adams] for about 1–2 months prior to preparing [the medical source statement]." *Id.* Third, the ALJ indicated that "[t]he limitations set forth lack sufficient support based on ongoing records, which have shown [Adams] to demonstrate consistent improvement with therapy, by his own reports." R. 30–31 (citing Exhibit 14F, pp. 27, 29, 21, and 34.) Finally, in the ALJ's view, Huskey's opined limitations in concentration, persistence, and maintaining pace were inconsistent with mental-status examinations showing "generally intact memory with an ability for [Adams] to concentrate and attend." R. 31 (citing Exhibits 4F, 6F, 7F, 8F, and 14F).

Continuing the sequential evaluation process, the ALJ determined at step four that Adams was unable to perform his past relevant work as an auto sales person or the composite job of a bar manager, bartender, bar helper, and cleaner. R. 31. At step five, the ALJ

determined that, given his age, education, work experience, and RFC, Adams could perform other jobs (e.g., a production worker and an inspector) that exist in significant numbers in the national economy. R. 31–32. Based on that finding, the ALJ determined that Adams had not been under a disability from his alleged onset date through the date of the decision. R. 32–33.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also

is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Adams contends that the ALJ erred in (1) rejecting his claims of disabling symptoms; (2) weighing the opinions of his therapist; (3) not including all of the consultative examiner's opinions in the RFC assessment; and (4) failing to account for his alleged variable functioning in the RFC assessment.

# I.	Alleged Symptoms

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* SSR 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

Adams argues that the ALJ misconstrued the record and failed to build an accurate and logical bridge between the evidence and his decision to reject Adams' complaints of disabling mental-health symptoms. *See* ECF No. 18 at 20–25. According to Adams, the ALJ provided five reasons for finding his statements not entirely consistent with the record and each one is deficient.

*First*, the ALJ concluded that Adams' reports of losing the bar he owned from 2010 to 2016 due to tax issues was somewhat inconsistent with his testimony that he lost the bar due to panic attacks. R. 28. Adams maintains that these statements are not inconsistent and that both are supported by the record. It's certainly conceivable that panic attacks could lead to business troubles, which could then lead to problems paying one's taxes. Indeed, Adams testified that "pretty much the last two years [owing the bar] everything was kind of snowballing because of my inability . . . to work." R. 60. Adams is therefore correct that the two explanations are not necessarily mutually exclusive. However, I conclude that the ALJ did not commit error by noting that the plaintiff provided two different explanations. Specifically, if the panic attacks were the cause of his tax troubles, one would expect that he would have explained that to his treatment providers, rather than simply attributing the loss of his business to unpaid taxes. Instead, Adams explained to APNP Ledvina that "he thought he was paying [taxes], but it became to[o] costly and he could not afford to pay the taxes or the land contract owner." R. 353. The original explanation therefore contained no link between the tax issue and his mental health. Accordingly, although in theory the two explanations *may* be consistent with one another, Adams himself never made that link. It was therefore fair game for the ALJ to point out the two different explanations.

*Second*, the ALJ determined that Adams' symptoms improved with treatment and medication management following an exacerbation in August 2017. R. 28. That finding is supported by substantial evidence. In August 2017, Adams complained of having "almost daily [panic attacks]," R. 483, culminating in a week-long hospitalization at the end of the month, *see* R. 440–49. Adams began group therapy a few days after being discharged, *see* R. 529, and he started one-on-one therapy with Huskey in December 2017, *see* R. 540. The record generally shows that Adams' anxiety symptoms improved in 2018. For example, a progress note from January 4, 2018, indicates that Adams reported that his "anxiety and panic attacks are less intense" "since Effexor increased to 150 Milligrams daily" and that "[h]e is able to go out of home 3 times per week." R. 554. Adams made similar statements to Huskey. *See* R. 557 ("holidays were good"), 559 ("Patient noted things are 'not that bad' . . . [and that he's] getting out and about more to thrift stores etc."), 563 ("patient noted anxieties less due to medication change and patient getting in shape"), 565 ("patient noted in past he would go to hospital overnight [for] issues like this but not now") ("review of how patient is gotten better with this and patient noted medication change"), 572 ("patient noted he is getting out as much as possible and going on errands with mother which is 'fine'") ("patient noted medication and giving self credit and pep talks are helpful") 574 ("patient noted med changes have been helpful in terms of anxiety"), 576 ("patient has been . . . going [to] thrift stores and doing some reading, patient noted he recently phoned old friends, . . . patient noted he has been chatting with strangers"), 579 ("patient noted no panic lately and patient is able to recognize anxiety better and coping better to prevent them from becoming severe"), 581 ("anxiety is the same"), 585 ("patient believes problems [are] 80% physical and 20%

anxiety"), 587 ("patient noted no panic attacks"), 589 ("patient noted still shopping with mother and sister on a regular basis which is good for patient to get out of the house").

Adams' contention that the ALJ cherry-picked periods of improvement while ignoring evidence of symptom exacerbation is not supported by the record. In the ALJ's detailed review of the medical evidence, he noted times when Adams reported worsening symptoms. For example, the ALJ discussed a progress note from October 2017 in which Adams reported that his anxiety and panic attacks had gotten worse over the last few months and that he was not leaving home. R. 26 (citing Exhibit 14F, pp. 1–11). The ALJ also discussed a progress note from January 2018 in which Adams claimed to still be having anxiety with racing and ruminating thoughts, panic attacks, and fear of going outside and functioning. R. 26 (citing Exhibit 14F, pp. 27–29). In fact, the ALJ mentioned nearly every period of symptom exacerbation that Adams claims he ignored. *See* R. 27 (citing Exhibit 14F, pp. 32, 34, 36, 38–39), R. 28 (citing Exhibit 13F, p. 25).

Out of the entire record, Adams cites only two treatment notes not discussed by the ALJ purportedly showing additional exacerbation after August 2017. *See* ECF No. 18 at 13. However, it is well established that "an ALJ 'need not provide a complete written evaluation of every piece of . . . evidence.'" *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (quoting *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012)). Moreover, these "ignored" records merely show that Adams continued to feel tired, anxious, and depressed. *See* R. 582, 589. But the ALJ never claimed that Adams was symptom free. Rather, he found that Adams' alleged symptoms were not as severe as alleged given his own reports of improvement. That finding is reasonable, and I will not reweigh the evidence that led the ALJ to that conclusion.

*Third*, the ALJ found that the record did not corroborate Adams' claims that he had been to the ER at least ten to fifteen times from June 2016 through 2017, that he had six or seven bad days per month when he doesn't leave home, and that he missed about fifty percent of his appointments due to an inability to leave home. R. 28–29. Adams does not dispute that he overstated the number of times he visited the ER and that the record does not show many appointments missed due to his alleged symptoms. He instead maintains that the ALJ mischaracterized part of his testimony. I agree in part. The ALJ indicated that Adams alleged he missed "about 50% of his appointments due to an inability to leave home." R. 29. What Adams actually said is that it was "fairly common" for him to be unable to leave the house for an appointment or something else he had to attend. R. 50–51. When asked how often this occurred during the last three years, Adams responded, "Let's say I would—if I would have two appointments a week *or things I had to be at*, I would probably say [I would miss] around 50 percent." R. 51 (emphasis added). In other words, Adams claimed he missed half of all his obligations, not half of his appointments.

Even if the ALJ oversimplified Adams' testimony, the ALJ reasonably concluded that Adams was able to leave the house more often than he alleged. The ALJ noted that therapy records since September 2017 revealed that Adams was getting out more—going to thrift stores, running errands with his mother, and shopping with his mother and sister—and communicating with others. *See* R. 29 (citing Exhibit 14F). The ALJ further noted that Adams testified that he drove, went grocery shopping by himself two or three times a month, and tried to take any opportunity to run errands. R. 29; *see also* R. 55–57. The ALJ did not, as Adams suggests, ignore limitations in these activities; in fact, the ALJ acknowledged that

Adams tried to stay close to home when he drove, avoided driving in situations where he could be gridlocked, and often shopped with his mother. *See* R. 20.

*Fourth*, the ALJ noted that, although Adams claimed to suffer from work-preclusive fatigue and absenteeism, he also acknowledged slightly improved sleep and attributed fatigue to issues aside from his anxiety and poor sleep. R. 29. Those statements are supported by the record. *See* R. 430 ("Continues to generally sleep poorly – slightly improved – 4-5 hour increments."), 561 ("patient noted having fatigue and feels it is moderate due to weight and smoking and lack of exercise"), 585 ("physical problems result in patient feeling 'wiped out'"). Adams maintains that his fatigue is largely tied to his anxiety, poor sleep, and medication side effects. Fair enough. But the ALJ never said it wasn't. The ALJ simply noted other factors that contributed to Adams' fatigue and a time Adams reported improved sleep. I see no error in the ALJ's discussion of those records.

*Fifth*, and finally, the ALJ concluded that therapy records since September 2017 revealed less intense panic and an increased ability to leave the house and socialize with others. R. 29. As discussed in detail above, this finding is supported by substantial evidence. The ALJ did not ignore evidence of worsening symptoms or fail to connect Adams' reported increased activity with his decision to reject Adams' alleged disabling symptoms.

Overall, I find that substantial evidence supports the ALJ's evaluation of Adams' subjective statements and that Adams has failed to demonstrate that the evaluation is patently wrong.

## II.    Treating Therapist

At the time of Adams' applications, therapists—unlike licensed psychologists—were not considered "acceptable medical sources" under the Commissioner's rules and regulations,

meaning their opinions could never be afforded controlling weight no matter how persuasive they are. *See* 20 C.F.R. §§ 404.1502(a), 404.1513(a)(2), 404.1527, 416.902(a), 416.913(a)(2), 416.927; SSR 06-03p, 2006 SSR LEXIS 5 (Aug. 9, 2006) (rescinded as of Mar. 27, 2017). Nevertheless, an ALJ may consider opinions from therapists using the same factors as for acceptable sources; those factors include the length, nature, and extent of the claimant's relationship with the therapist; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the therapist is a specialist. *See* 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1); SSR No. 06-3p, 2006 SSR LEXIS 5, at *10–11 (citing §§ 404.1527(d), 416.927(d)). After considering the applicable factors, the ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2).

Adams argues that the ALJ failed to provide good reasons for finding not persuasive the opinions contained in the medical source statement of his treating therapist, Thomas Huskey. *See* ECF No. 18 at 17–20. Adams first maintains that the ALJ misconstrued the record when he noted that Huskey stated that his opined limitations were "per patient'" and "based largely on subjective allegations." *Id.* at 17 (citing R. 30). I agree. Huskey never stated that any of his opined limitations were based on Adams' subjective allegations. *See* R. 470–74. Rather, when asked to explain his opinion that Adams needed to lie down for one hour during the workday due to fatigue or related symptoms, Huskey wrote, "per patient":

## 1. FATIGUE

Does your patient exhibits at least episodic severe **fatigue** or related symptoms (e.g. lack of motivation, malaise, sedation from medications, loss of endurance, lethargy) necessitating lying down during a typical 8 hour daytime period? ☑ yes ☐ no

If yes, what causes your patient's fatigue? (Check all that apply):
☐ prescribed medications ☐ depressed mood ☐ disturbed sleep ☑ other: WEIGHT/ SMOKING/ LACK OF EXERCISE

**How many hours** during typical 8-hour daytime period would your patient likely need to **lie down** due to fatigue or related symptoms? ☑ 1 hour ☐ 2 hours ☐ 3 or more hours

Please explain: _____ PLAN PARKINS _____

R. 470. Huskey did not state that any of his other work-preclusive opinions (i.e., excessive absences, need for unscheduled breaks, and need for an unusual level of supervision) were based on Adams' self-report.

Nevertheless, substantial evidence supports the other reasons the ALJ provided for rejecting Huskey's opinions. *See Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (citations omitted) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are."). The ALJ noted that Huskey had seen Adams for only one or two months prior to completing his medical source statement. Adams maintains that this too was a misconstruction of the record, as Huskey first saw Adams for group therapy in September 2017—that is, four months prior to the January 2018 medical source statement. *See* ECF No. 18 at 18 (citing R. 530, 534). It's true that four is greater than one (or two), but I'm not sure the difference is material. Even if the ALJ did slightly misstate the record, the ALJ's point was that Huskey did not have a lengthy treatment relationship with Adams. *See* §§ 404.1527(c)(2), 416.927(c)(2). Moreover, it appears that the ALJ was referring to how long Huskey had been seeing Adams for one-on-one therapy, which did begin on December 4, 2017—that is, approximately seven weeks before Huskey filled out the medical source statement. *See* R. 540–51. Indeed, Huskey himself indicated on the form that he initiated treatment with Adams on December 4, 2017:

TO: ~~Trevor Huskey, LCSW~~

RE: ~~Luke Adams~~

Date initiated treatment: ~~12.4.17~~

R. 470.

The ALJ also rejected Huskey's opinions because they were inconsistent with and not supported by other evidence in the record. *See* §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4). The ALJ concluded that the ongoing records, in which Adams demonstrated "consistent improvement with therapy," generally did not support Huskey's opined limitations. R. 30–31 (citing Exhibit 14F, pp. 27, 29, 21, and 34). As with the evaluation of his subjective allegations, Adams maintains that the ALJ cherry-picked this evidence and ignored evidence showing variable functioning, or "ups and downs." *See* ECF No. 18 at 18–19. Again, I disagree. The ALJ didn't indicate that the ongoing records showed that Adams was symptom free. Rather, the ALJ determined that, despite periods of worsening symptoms, the recent records revealed that Adams' symptoms improved with therapy and medication to the extent he didn't have severe functional limitations. Substantial evidence supports this finding and is inconsistent with Huskey's opined limitations. *See, e.g.*, R. 554–89 (reporting improved anxiety symptoms with therapy and medication change).

The ALJ further concluded that the mental-status examinations did not support Huskey's opined marked limitation in concentration, persistence, or maintaining pace, as the exams generally showed "intact memory with an ability . . . to concentrate and attend." R. 31 (Exhibits 4F, 6F, 7F, 8F, and 14F). Adams maintains that these exam findings do not detract from the supportability of Huskey's opined limitation because time-limited, one-on-one exams do not mimic the stressors found in full-time, competitive employment—the situation Huskey was asked to imagine when completing his medical source statement. *See* ECF No.

21

18 at 19–20. The ALJ, however, never equated normal mental-status exams with an ability to work.

Adams also maintains that the mental-status exams *do* document concentration deficits. *See* ECF No. 18 at 20. In support, he cites only three examples. *See* R. 380 ("attends well though does need information re-explained"), 538 ("Attention/Concentration: poor"), 555 ("Attention/Concentration: poor"). The ALJ, however, reasonably found more persuasive the multitudinous exams revealing unremarkable findings in concentrating, persisting, and maintaining work pace. *See, e.g.*, R. 377 ("Able to attend/concentrate"), 381–84 ("attends well"), 388 ("Able to attend/concentrate"), 409 ("Recall and memory were intact"), 413 ("Recall and memory were intact"), 431 ("Recall and memory were intact"), 445 ("short and long term memory intact"), 550 (noting good memory, concentration, and attention), 570 ("Attention and concentration are unremarkable") ("Remote and immediate memories intact"), 583 ("Attention and concentration are unremarkable") ("Remote and immediate memories intact"), 598 ("short and long term memory intact"), 603 ("Memory: Immediate, intermediate, and remote intact").

Accordingly, Adams has not demonstrated that the ALJ erred in weighing the opinion of his treating therapist.

## III.  Consultative Examiner

In his psychological report, consultative examiner Mark Pushkash opined (among other things) that Adams' "ability to concentrate and persist on tasks at work is likely to be moderately to severely impaired due to the interfering effects of anxiety." R. 420. Adams argues that the ALJ's RFC assessment accounted for only the low range of Dr. Pushkash's opinion (i.e., moderate limitations) and failed to account for or explain why he rejected the

high range (i.e., severe limitations). *See* ECF No. 18 at 14–15. I disagree. The ALJ explicitly determined that Dr. Pushkash's opinions were "persuasive and *consistent with moderate limitations as set forth in the residual functional capacity*." R. 30 (emphasis added). By specifying that Dr. Pushkash's opinions were consistent with moderate limitations, the ALJ implicitly rejected Dr. Pushkash's more severe limitations.

The ALJ also explained that the moderate limitations were "supported by [Adams'] presentation at [the consultative] examination as well as more recent therapy records at Exhibit 14F." R. 30. This finding is supported by substantial evidence in the record. In his report, Dr. Pushkash noted that Adams "has no difficulty paying attention and there are no signs of distractibility or other symptoms of attention deficit hyperactivity disorder." R. 418. Likewise, the recent records referenced by the ALJ revealed that Adams' anxiety symptoms improved in 2018 with therapy and a medication change and that he did not have more than moderate limitations in attention and concentration. *See, e.g.*, R. 570 ("Attention and concentration are unremarkable"), 583 ("Attention and concentration are unremarkable"). Accordingly, Adams has not demonstrated that the ALJ erred with respect to Dr. Pushkash's opinions.

## IV.    Variable Functioning

Adams alleges that he is unable to work because his mental-health symptoms wax and wane such that he is unable to consistently leave the house, show up to work on time, or maintain pace when he's there. According to Adams, this variable functioning is supported by the medical evidence in the record, as well as the opinions of Dr. Pushkash (the consultative examiner)—who opined that Adams' ability to concentrate and persist on tasks would range from moderately to severely impaired—and Huskey (the therapist)—who opined

that Adams would frequently be absent from work, would need unscheduled breaks, would be off task fifteen percent of the workday, and would frequently need an unusual level of supervision to start or complete even simple work tasks. Adams argues that the ALJ failed to account for his alleged variable functioning in the RFC assessment and that this omission is material because the vocational expert testified that those resulting limitations were work preclusive. *See* ECF No. 18 at 10–14.

Adams' variable functioning argument is not persuasive. In essence, this argument is an amalgamation of Adams' other three arguments to the extent he fails to explain how the ALJ could have accommodated his alleged variable functioning without fully adopting all of his subjective allegations, the extremely restrictive opinion of Huskey, or the most severe opinion of Dr. Pushkash. However, I have already addressed, and rejected, each of those arguments. The consolidated argument fares no better. The ALJ determined that Adams had severe mental impairments that impacted his ability to work, and the ALJ's RFC assessment accommodated those impairments with a number of non-exertional limitations. *See* R. 16–19. In assessing that RFC, the ALJ thoroughly considered Adams' allegations, the objective medical evidence, and the prior administrative findings and medical opinions in the record. *See* R. 19–31. The ALJ acknowledged that, although at times Adams complained of worsening symptoms, he reported significant improvement in the recent records. The ALJ therefore accepted many of Adams' allegations but found that more severe limitations were not supported by the record. For reasons already discussed above, that finding is supported by substantial evidence.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ's decision is supported by substantial evidence and that Adams has not demonstrated that the ALJ committed reversible error in rejecting his allegations of disabling physical symptoms, finding not persuasive the opinion of his treating therapist, failing to accept all the opined limitations of the consultative examiner, or failing to accommodate his alleged variable functioning. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 12th day of May, 2021.

STEPHEN C. DRIES
United States Magistrate Judge